Marvin EMERY, Jack Marzolf, Carl Matson, Byron Sundberg, Alfred Diest, Vernon Brodsho, Marvin Townsend, James Shultz, Darrell Snyder, Robert Evans, Richard Williams, Robert Salisbury, Alan Garbutt, Martin Pedersen, William Emery, David Funderburk, Roy E. Minard, Ronald R. Baker and Tony Papantonakis, Appellants (Appellants below),

v.

CITY OF RAWLINS, a Wyoming Municipal Corporation and City of Rawlins, Carbon County, Wyoming Local Improvement District No. 1977–2, Appellees (Appellees below).

No. 4962.

Supreme Court of Wyoming.

June 20, 1979.

Kermit C. Brown, MacPherson, Golden & Brown, Rawlins, for appellants.

Michael W. McCall, Borthwick & McCall, Cheyenne, Harold M. Johnson and Steve D. Noecker, Johnson & Noecker, Rawlins, for appellees.

Before RAPER, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and GUTHRIE, J., Retired.*

---

* At the time of oral argument Guthrie, J. was Chief Justice. He retired from the court on December 31, 1978. By order of the court, entered January 1, 1979, he has been retained in active judicial service pursuant to § 5, Art. V, Wyoming Constitution and § 5–1–106(f), W.S.1977, and has continued to participate in the decision and opinion of the court in this case.

McCLINTOCK, Justice.

Marvin Emery and others, owners of lots or tracts within the boundaries of an improvement district in the city of Rawlins, attack the assessments against those properties. Their written protests were denied after hearing before the city council, sitting as a board of equalization, and the district court of Carbon County affirmed. On appeal to this court it is contended that the ordinance confirming the assessment was enacted in violation of § 9–11–101, et seq., W.S.1977 entitled "Meetings of Governmental Agencies," and that the method of assessment employed by the city should be set aside for failure to conform to and implement standards set forth in § 15–6–404(b)(iv), W.S.1977. This statute provides in pertinent part that property within an improvement district "shall be assessed on an area basis, or lineal foot basis, or any other uniform basis so that property similarly benefited will be similarly assessed." The statute is not attacked but the alleged failure properly to apply it is claimed to be in violation of appellants' rights under the due-process and equal-protection clauses of the federal and state constitutions.

Appellants' protests mainly involved an alleged lack of uniformity in assessments as between adjacent or comparable properties, in most cases involving variations between interior and corner lots claimed to have resulted from improper credit allowed for existing improvements. Martin Pedersen and Vernon Brodsho further allege an improper computation of benefits resulting from the use of commercial or residential classifications in fixing the amount of acreage to be charged with the benefits. We shall affirm.

The district was formed for the purpose of installing sewer, curb and gutter, and asphalt paving. Assessments for the storm sewer, imposed on an area basis, were not contested. The district is somewhat unusual in that within its area some curb and gutter, or paving, or both, had already been installed. In some instances this had been done by the developer, in others by the owners of the particular properties. The record does not show the exact quantity and location of such existing improvements, nor the cost thereof. The council, in its resolution of intention to make the improvements and in the ordinance ordering the construction to proceed, does not mention commercial and residential classifications. It did set forth the method of assessment of benefits that should be followed and it is not denied that that method was applied. Essentially, the council determined that a computation should first be made of total quantities and costs of all improvements within the district as if none then existed. This total cost would be determined by using the contractor's unit bid price of $6 per lineal foot for curb and gutter, and $5.75 per square yard of paving. The resulting project cost (being an amount materially in excess of the total amount which was to be paid to the contractor) was then to be spread against each lot or tract in the district in the proportion that the square footage of that property bore to the total square footage of all properties within the district. Both the resolution and ordinance then provide:

"* * * Deductions from individual property owners' assessments for existing curb and gutter, pavement, and all other appurtenances of existing improvements will then be made for each lot, parcel and piece of property with existing improvements."

Neither document sets forth the manner in which these deductions are to be computed but both refer to a unit price of $6 per lineal foot for curb and gutter and $5.75 per square yard of paving. The record clearly shows that the consulting engineer for the city and the council used those figures in computing the deductions. Ordinance of the council approved the assessment roll, which showed a spread assessment of 21.34¢ for curb and gutter and paving, with deduction where pertinent for existing improvements, resulting in the "total assessment due on lot." The ordinance confirming this assessment further directed that the assessment roll be turned over to the city treasurer for collection and that notice of such

filing be published. The ordinance was effective March 15, 1977. No contention is made of any procedural defect other than violation of the public-meeting law.

Neither the resolution nor the ordinance defines the manner in which the square footage of the particular lot or tract charged with benefits is to be determined. In most instances it was determined upon the actual number of square feet. The record is not entirely clear what happened in some instances but it appears that during the course of computing the assessments the engineering firm for the city made its own determination that no "residential" lot would be treated as being more than 125 feet in depth and no "commercial" lot would be more than 180 feet in depth. This fact was made known during the course of the hearings on the assessment roll and by the final ordinance the acts of officers of the city are ratified so it may be considered that final approval of the assessment district and the computation of acreages is the action of the council. The appellants Vernon Brodsho and Martin Pedersen include alleged discrimination in this respect as an additional ground of their protest.

### The alleged violation of the public-meetings law

Chapter 11 of Title 9, W.S.1977, Meetings of Governmental Agencies, first declares that the various agencies exist to conduct public business. "Action" of a governing body is defined as "the transaction of official business, including a collective decision * * * commitment or promise" to make a decision, or an actual vote "upon a motion, * * * resolution, * * * rule * * * or ordinance." "Meeting" is an assembly of the governing body at which action is taken. § 9–11–102(a)(i) and (iii). The law further directs that meetings of a governing body be open and that no action of the body shall be taken except at a meeting held in accordance with the act. "Action taken at a meeting not in conformity with this act is null and void." § 9–11–103.

In their appeal timely filed in the district court appellants said nothing about any violation of the public-meetings law but by motion filed almost two months later they asked the court to set aside the action of the council overruling their protests and also to set aside the ordinance confirming the assessment roll. If the denial of the protests as announced at the end of the hearing on September 21 was the result of an agreement or decision reached by the council in a secret meeting held before the open meeting, this court would be obliged to declare the formal action of the council void. However, before reaching that point we first consider the city's contention that this attack upon the denial of the protests and the passage of the ordinance confirming the assessment roll was not timely and should not have been considered by the district court.

Section 15–6–407, W.S.1977 permits review by the district court of the council decision approving the assessment roll. It directs that the notice of appeal shall set forth a description of the property "and the objections of the appellant to the assessment." Within ten days of filing the notice the appellant must also file a transcript of the assessment roll and "his objections thereto." If we considered the notice of appeal in light of this section only, we perhaps could say that appellants were confined by their appeal to the objections which they had specifically raised. In *Mayland v. State,* Wyo., 568 P.2d 897, 899 (1977) we held that the district court should have dismissed an appeal from justice court where the appellant had failed in his notice of appeal to state with particularity the alleged errors or other grounds for the appeal as required by Rule 23(c), W.R.Cr.P. J.C. However, we think that the statutory requirement that the objections be stated in the notice of appeal must be construed in connection with § 15–6–405 relating to the filing of objections and hearing thereon. That section requires the city clerk to give notice of hearing upon the assessment roll. Interested persons may then object in writing, filing the same before the hearing. The council then sits as a board of equaliza-

tion to consider the objections to the tax roll. They are then to consider the objections and correct or revise the roll, may set it aside, order new assessments, and then proceed to confirm the roll by ordinance. Paragraph (c) of the section directs that:

"All objections to the roll shall state clearly the grounds of objections and unless made within the time and in the manner prescribed are conclusively presumed to have been waived."

If any roll is amended so as to raise assessments or to include omitted property a new hearing on a new notice must be held.

"However, when any property has been entered originally upon the roll and the assessment upon the property has not been raised, no objections thereto may be considered by the governing body or by any court on appeal, unless they were made in writing at or before the date fixed for the original hearing."

■ Judicial review of the council's decision is clearly limited to those objections which were made. But obviously no person can know in advance of the protest hearing that a city council intends to decide the matter at a secret meeting not in conformity with the public-meetings law. Advance objection on the point now raised was impossible. Construing sections 405 and 407 together, we believe the legislature intended to foreclose court attacks upon the assessment only as to those points which could have been but were not placed before the council. Section 405 is predicated on the assumption that the governing body will proceed legally and the appeal provided in section 407 is not intended as a substitute for proper inquiry into procedural legality. The chapter does not state in what manner action of a governing body can be nullified, but it would be highly technical to deny relief from improper action bearing upon the power of the agency to act and not even known to the property owner. The motion appears to have been promptly filed after discovery of the alleged violation. There is no claim of want of jurisdiction of the subject matter, the city has not been in any way misled, and the motion gave full notice

of the claim of invalidity. The issue was fully tried before the district judge so that even if a separate action might have been a technically more correct procedure, we see no reason why it was not proper for the trial judge to consider the question upon its merits.

■ Appellants argue that prior to the public hearing the city at a closed meeting discussed and took collective, deliberative action on their protests and upon the question whether the assessment roll should be confirmed. We shall not attempt a detailed analysis of the evidence but counsel summarizes the events before the meeting: that members of the council began arriving at about 7:00 p.m., a half-hour before the scheduled meeting; that there was informal discussion between some of these councilmen, the mayor, the engineer for the district and bonding counsel of the progress of the improvement district, the agenda for the evening, certain negative assessments, possibility of changing the assessment method, how protests should be disposed of, possible alternatives, and recommendations of the bonding counsel. This discussion is said by counsel to have given

" * * * members of the council an opportunity to query and feel each other out concerning their feelings about the improvement district, * * * other matters on the agenda and to seek advice from the improvement district engineer and bonding counsel concerning protests to the district and how they should be handled by the council."

There is nothing to show that there was any attempt at concealment or to preserve secrecy concerning this informal gathering; no one was denied admission to the mayor's office in which the discussions took place; it is not shown that any explicit or tacit agreement was reached as to what course the council would pursue. As counsel himself states, a city council "may gather informally for the purpose of discussing a subject and soliciting expert advice so long as no vote is taken nor a collective decision made." Counsel points to nothing showing that a *collective* decision, commitment or

promise was made or reached in these informal conversations.

Neither the trial judge's decision letter nor the judgment itself makes findings upon the circumstances surrounding the informal and formal meetings, but he did orally summarize his view of the evidence at the close of the motion hearing:

"* * * [N]othing covert is indicated. There is no indicia from the evidence in this case that the council in any manner adopted a course of action or acted in any manner in concert which indicated what they would do at the particular meeting * * *.

"In short, taken under the most liberal construction of the Florida and California cases as indicated to the Court by counsel, I would fail to understand that this was in any manner a closed meeting in which decisions were made or action was indicated which would direct the course of any of the meeting following the whatever you want to call it, the preliminary gathering of the council."

We have carefully read the evidence and are of the opinion that Judge Hill's view of the situation is correct; that no collective decision, commitment or promise resulted from the "preliminary gathering" and there was therefore no transaction of business and no violation of the public-meetings law.

*The alleged failure properly to apply the statutory requirements as to the assessments, thereby resulting in denial of constitutional rights of appellants*

■ As well they might, appellants concede the general authority of the city to create the district and to assess against the real property therein the cost of such improvements as special benefits. *Mealey v. City of Laramie,* Wyo., 472 P.2d 787, 791 (1970). By such legislation the city or town is granted plenary powers as to such improvements. *Mealey,* supra; *Marion v. City of Lander,* Wyo., 394 P.2d 910 (1964), cert. denied 380 U.S. 925, 85 S.Ct. 929, 13 L.Ed.2d 810, reh. denied 380 U.S. 989, 85 S.Ct. 1352, 14 L.Ed.2d 283 (1965). The city exercises a legislative power which "rests in the legisla-

tive discretion of the city council." *Mealey,* supra; *Marion,* supra. However, the courts will interfere "if the city council exceeds its powers or exercises a discretion in a fraudulent, arbitrary or capricious manner." *Mealey,* supra; *Marion,* supra.

■ Section 15–6–404, W.S.1977 directs that the assessment district shall include all property benefited by the improvement "as determined by the governing body." Assessments may be computed in one of several described ways, the one pertinent to this case having been quoted in the opening paragraph of this opinion. Appellants concede that the city has considerable latitude to establish the boundaries, determine the property benefited and implement a method of assessment to defray the costs. They do not question the constitutional propriety of the statute but rely on the requirement thereof that the assessments be on a "uniform basis so that property similarly benefited will be similarly assessed."

Appellants assert at length that the "method employed results in a grave disparity in the amount of assessment between properties within the improvement district deriving no discernible difference in benefits"; that the city "has exceeded its powers granted by statute and has attempted to implement an unconstitutional discriminatory method of assessment"; and that excess of assessment over benefit "is a taking of property without due process of law as contemplated by the United States Constitution as well as the Wyoming Constitution." Proof of these assertions is found by appellants in a comparison of the total assessments due on the lots. Comparison is made of the net assessment of some interior lots with nearby corner lots. Comparison is also made between adjacent lots where improvements have already been installed as to both, yet one lot receives a higher net assessment than the other.

We find no fault with general principles of law advanced by appellants or with their citation of authority; we think only that they fail in their application thereof to the facts of this case. We find the basic fallacy in their reasoning to rest in their equation

of the net assessment (the spread assessment reduced by the computed cost of improvements already installed) with the amount of benefit which a particular lot has received. Having done this, it is not difficult to argue that surely the one lot must have received a benefit equal to the other; therefore a disparity in the assessment therefor is the result of an arbitrary and capricious method. Actually, what the city has done is to make an allowance for the work which has been done by or in behalf of the particular lot owner. Had there been no improvements already in place, each lot owner would have had to pay the full amount of the spread assessment and comparison of these amounts results in no substantial, or certainly unconscionable, imposition upon one owner. The manner in which the city has handled this existing construction is to treat it as a payment upon the assessment, measured by the benefits of the cost of construction.

There was some argument in the course of the proceedings as to whether a developer had paid the costs of the existing construction and then sold interior and corner lots for the same or different price. The evidence on this point is inconclusive but we do not think that it matters whether payment was made by a developer or by the lot owner himself. By reason of that expenditure, the improvement district has been saved that amount of money. In the absence of evidence that such costs were actually spread to other lot owners, no good reason exists why the "payment" should not be considered as made by or in behalf of the present lot owner.

■ Bearing in mind that the proceedings of the city council "are clothed with a presumption of regularity," *Marion v. City of Lander,* supra, 394 P.2d at 914, it follows that the objecting lot owner has the burden to show arbitrary or illegal action on the part of the city. We hold that that burden has not been met by merely showing difference in net assessments due. As between interior and corner lot owners and as between adjoining lots, having similar spread assessments but dissimilar net assessments, we uphold the finding of the district court that there was no discrimination. There is then no violation of due process or denial of equal rights in this respect.

## Whether the council improperly treated commercial and residential lots upon a different basis

■ As we have said, the engineering firm handling the project and preparing the assessment roll determined that it would use a different method of computing the square footage of the lots as between properties zoned as commercial and those zoned as residential. The depth of property zoned as residential would be considered as not exceeding 125 feet while commercial property would be limited to 180 feet. Although there is no showing in the record as to the zoning status thereof, large tracts belonging to three churches, the school district and the Bureau of Land Management were likewise limited to 180 feet.

Adjoining lots of protestant Brodsho and a nonprotestant named Withrow on the west side of Harshman Street are used as income-producing trailer parks but are zoned as residential. Because of this and even though the lots are 200 feet or more in depth, the assessment area thereof was computed on the basis of 125 feet in depth. On the east side of this street Brodsho and Pedersen own lots, likewise more than 200 feet in depth, but used respectively in a contracting and engineering business. Assessment against these lots, zoned as commercial, was computed on the basis of 180 feet in depth.

Neither the resolution of intention nor subsequent ordinances relating to the district and approving the assessment roll contain any language recognizing this distinction but Mr. Blackwell, the engineer in charge of the work and computation of the assessment, explained that commercial lots are usually much larger than residential lots and the average depth of the former is 180 feet while the average depth of the latter is 125 feet. Application of these criteria to the pertinent lots on Harshman Street meant that the trailer-park proper-

ties received a lesser relative assessment than the business properties on the east of the street. Approval of the assessment roll by the city council signifies its acceptance and approval of this distinction.

Brodsho and Pedersen argue that use of this distinction violates the equal-protection clause of the 14th Amendment to the Federal Constitution by creating classifications not based upon a rational difference. They contend that the resulting assessment therefore arbitrarily imposes different burdens on similarly situated properties within the district. With the exception of *Costello v. City of Los Angeles,* 54 Cal.App.3d 28, 126 Cal.Rptr. 462 (1975), we do not think that the cases cited by them do more than establish general principles of doubtful application to the facts of this case. Thus, *Dorsey v. City of Atlanta,* 216 Ga. 778, 119 S.E.2d 553, 555 (1961), reh. denied, holds only that a statute which permits a municipality to discriminate among its citizens offends the guaranty of equal protection. *Scarsdale Chateaux RTN v. Steyer,* 81 Misc.2d 662, 366 N.Y.S.2d 792, 797 (1975), states that the business district cannot be singled out for assessment for a parking structure as opposed to defraying the cost thereof from contributions from all who are benefited. *Davies v. City of Lawrence,* 218 Kan. 551, 545 P.2d 1115 (1976) holds the question to be not as to the particular use which is being made of the property assessed, but whether the property is enhanced in value for any purpose by reason of the improvement.

It may be conceded that both commercial and residential properties are benefited by an improvement district of this kind but the city council has made the legislative determination that since commercial lots are generally larger than residential, it is proper to permit a greater assessment against them. However, in no case shall the benefit be considered as extending beyond the established average depth. We do not find such classification either arbitrary or discriminatory. While this assessment was not made under § 15–6–404(b)(i), W.S.1977, it is consistent with the principle recognized therein which permits the establishment of three zones within an assessed half-block, with 60% of the cost allocated to the zone nearest the street, 30% to the next nearest zone, and 10% to the zone furthest away from the improvement. Section 15–6–404(c) permits adjustment for irregular or nonuniform blocks and parcels "so that the assessment there against shall be in proportion to the benefits derived." Because of the great disparity in the size of lots and tracts within the district the council considered it necessary to make some adjustment on the basis that benefits cannot be measured strictly on the amount of acreage within the particular lot and we do not think that that general determination can be said to have deprived the Brodshos and Pedersens of their constitutional rights. No evidence has been adduced that the council acted arbitrarily or capriciously in making this depth limitation, applying generally to all tracts of land within the district, and we can find no reason why we should hold that it is. As is said in 14 McQuillin Municipal Corporations, § 38.184 at pp. 458–459:

> "There is a presumption that the findings of a city council as to special benefits are correct, and this presumption can be overcome only by strong, direct, clear and positive proof. The determination of the assessing authorities as to what property is benefited and the extent or value of the benefits, is generally held conclusive, and cannot be questioned except in cases of fraud or manifest mistake; in some states the statutes expressly accord this effect to their determination, because the question is legislative."

As we said in *The Chicago & Northwestern Ry. Co. v. City of Riverton,* 70 Wyo. 84, 111, 246 P.2d 789, 800 (1952), reh. den. 70 Wyo. 119, 247 P.2d 660:

> "* * * For a case such as that before us, the rule applies that when the legislature, (or its duly delegated agent for that purpose as stated supra), determines what property is benefited and shall be assessed, such determination is well nigh conclusive."

Our most recent pronouncement appears in *Blount v. City of Laramie,* Wyo., 510 P.2d 294, 299 (1973), reh. denied:

"* * * From our examination of the record we cannot say there is any basis for a determination that the city council exceeded its powers or acted fraudulently, arbitrarily or capriciously in determining which property should be included in the improvement district and the method in which the assessments were to be apportioned. Our examination of the record convinces us that the method of apportioning the assessments was as authorized by law * * *."

In *Costello v. City of Los Angeles,* supra, the court held invalid a determination by the assessment official that benefits should be assessed only to the extent of 135 feet in depth. The official had no basis for his decision except that it was a procedure that had been followed for many years. This was held to be arbitrary. Here, there is involved a large area of widely varying depths and sizes of lots and the legislature has recognized that adjustment should be made. We hold that the distinction was not unreasonable, nor did it represent fraudulent, arbitrary or capricious action on the part of the city council.

 However, the city council has applied a zoning ordinance which classifies trailer parks as residential. It is difficult to see how such differentiation can have any bearing upon the question of assessment of benefits in an improvement district but we find only two instances in which it can be shown that a misapportionment of the project cost has been effected. One of those instances relates to Brodsho himself since his trailer-park property is one of those that has been limited to 125 feet whereas it in all probability should have been assessed to a depth of 180 feet. The other instance is Withrow's trailer-park property but he is not a party to the litigation. Were we to order a reassessment of the Brodsho and Pedersen properties which are admittedly commercial, on a 125-feet basis, it is clear that they would receive a benefit not contemplated by the law. We cannot order a reassessment of the other Brodsho property and the Withrow property under the provisions of § 15–6–407 which limits the power of the city council to the protests as filed, and limits the power of the reviewing court to confirm, correct, modify or annul the assessment "insofar as it affects the property of the appellant." We cannot find that the properties of Brodsho and Pedersen have been overassessed since they have been assessed in accordance with the principles we have sustained. Reassessment of their property on the basis of a computed assessment for the trailer-park properties on a basis of 180 feet in depth instead of 125, with that "saving" spread throughout the district would certainly be so small that the doctrine of *de minimis* must apply. We therefore do not choose to enter such an order.

The judgment is affirmed.